IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JANICE S. HAAGENSEN,                    )
                    Plaintiff,          )
                                        )
        vs                              )        Civil Action No. 08-727
                                        )        Judge Ambrose
PENNSYLVANIA STATE POLICE, et al.,      )        Magistrate Judge Mitchell
                    Defendants.         )

REPORT AND RECOMMENDATION

I.      Recommendation

        It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendants Pennsylvania State Police, Clyde Jones, Todd Scott, Christian Winter and

the Pennsylvania Game Commission on the non-constitutional issues of Plaintiff's complaint

(Docket No. 105) be granted with respect to the Plaintiff's due process and equal protection

claims and denied with respect to her First Amendment retaliatory prosecution claim.

II.     Report

        Plaintiff, Janice S. Haagensen, proceeding pro se,[1] brings this action pursuant to 42

U.S.C. § 1983 against Defendants, the Pennsylvania State Police, three State Police Troopers

(Christian Winter, Clyde Jones and Todd Scott), the Pennsylvania Game Commission, Game

Warden Jeffrey Kendall and eleven individuals (Michael McBride, Nathaniel Akins, Leslie

McBride, Gary Ferrigno, Cathy Vasko a/k/a Cathy Ferrigno a/k/a Cathy Leary, George Stevenish,

Ben Sherry, Jordan Snyder, Ralph Joy, Jr., Shane Sparks and Jay McBride).  Plaintiff alleges that

_____

        [1]Although she is proceeding pro se in this matter, Plaintiff is in fact an attorney and has
filed several cases before this Court on behalf of clients, in addition to the two cases she filed in
which she is also the plaintiff.  See Grine v. Coombs, No. 95-342E; Stacey v. City of Hermitage,
No. 02-1911; Ferguson v. Haney, No. 98-1223.

she was subjected to false arrest and malicious prosecution in violation of her Fourth
Amendment rights when the eleven individuals (hunters who were on or near her property) acted
in concert with the state troopers to have her charged and prosecuted for allegedly violating
Pennsylvania's Hunter Harassment Statute, 34 Pa. C.S. § 2302 ("the HHS"), and the criminal
harassment statute, 18 Pa. C.S. § 2709.  She challenges the constitutionality of both acts, the
HHS on its face and as applied to her and § 2709 as applied to her, as violative of her rights
under the First and Fourteenth Amendments, and she alleges that the Defendants retaliated
against her for exercising her freedom of speech and violated her rights to due process and equal
protection of the laws.  She also raises state constitutional and common law claims.

In December of 2001, within the span of one week, Plaintiff was given eight citations for
violating § 2709 and two subsections of the HHS, namely §§ 2302(a.1)(2) and (7).[2]  She pled not
guilty, but she was convicted of six of the charges before a district justice[3] on April 9, 2002.  She
filed appeals to the Court of Common Pleas of Lawrence County from these summary
convictions and de novo hearings were held on July 28, 2004, August 6, 2004 and October 8,
2004.

On March 18, 2005, Plaintiff was convicted by the Honorable Dominick Motto, President
Judge of the Court of Common Pleas of Lawrence County, of one count of violating § 2709 and
four counts of violating §§ 2302(a.1)(2) and (7) of the HHS.  The trial court held that these
sections were constitutional on their face and as applied to the facts of her case and that the

---

[2]As detailed below, a criminal complaint was also filed against her for making false
reports to law enforcement authorities, but these charges were withdrawn by the district attorney.

[3]Effective January 29, 2005, district justices were renamed magisterial district judges.

Commonwealth had submitted sufficient evidence to convict her of each of the alleged offenses by proving that she did in fact harass the victims and interfere with their hunt. She was sentenced to pay the costs of prosecution and fines ranging from $50.00 to $500.00. She then appealed her convictions to the Pennsylvania Commonwealth Court.

By opinion dated June 2, 2006, the Commonwealth Court reversed the convictions. The court held that the Commonwealth had failed to adduce sufficient evidence that Plaintiff acted with the specific intent to violate the HHS.[4] The opinion was published as Commonwealth v. Haagensen, 900 A.2d 468 (Pa. Commw. 2006).

Plaintiff filed the instant case, and various motions to dismiss were filed on behalf of numerous defendants. After a Report and Recommendation and Supplemental Report and Recommendation were filed and adopted as the opinions of the Court, the following claims remained in the case: in Count I, the constitutional challenges to the HHS and § 2709 (against the State Police and the Game Commission), and the claims of First Amendment retaliation, violation of due process and equal protection (against all defendants except Game Warden Kendall, who was dismissed from the case); in Count IV, the constitutional challenges to the HHS (against the State Police and the Game Commission). At a status conference on June 11, 2009, the case was bifurcated, as follows: Plaintiff and the Commonwealth Defendants (namely, the State Police, Troopers Winter, Jones and Scott and the Game Commission) were scheduled to

---

[4]There appears to be a discrepancy between the record at the trial court level–which indicates that Trooper Jones filed two charges under § 2709 against Plaintiff arising out of the incident involving the Ferrignos–and the record from the Commonwealth Court–which treats the charges arising out of this incident as having been filed under the HHS. It is not necessary for the Court to resolve this discrepancy in the state court records (and it would be impossible for the Court to do so in any event).

file cross-motions for summary judgment on the constitutional challenges and Plaintiff and all defendants were scheduled to proceed to mediation on the non-constitutional issues.  At a subsequent status conference on October 2, 2009, the Commonwealth Defendants reported that the mediation on the non-constitutional issues had been unsuccessful and they requested leave to brief these issues as well.

On October 22, 2009, a Report and Recommendation was filed, recommending that the Commonwealth Defendants' motion for summary judgment as to the constitutional challenges be granted and that Plaintiff's cross-motion for summary judgment be denied.  On November 16, 2009, the Report and Recommendation was adopted as the opinion of the Court.

Thus, the only remaining claims are those alleging that the Defendants retaliated against Plaintiff for exercising her right to freedom of speech and violated her rights to due process and equal protection of the laws.  For the reasons that follow, the Commonwealth Defendants' motion for summary judgment should be granted with respect to the due process and equal protection claims and denied with respect to the First Amendment retaliatory prosecution claim.

Facts

Todd Scott is currently employed by the Pennsylvania State Police as a Trooper assigned to Troop D, New Castle barracks.  He has been so employed since 1992.  (Scott Decl. ¶ 1.)[5] Trooper Scott filed two citations against Plaintiff for events that occurred on or about December 8, 2001.  Other than those two citations, Trooper Scott has never filed any criminal charges or citations against her.  (Id. ¶ 2.)  At some point after December 8, 2001, Trooper Scott responded to Plaintiff's complaints that unknown individuals had stolen her no trespassing or no hunting

_____

[5]Commw. Defs.' Concise Statement (Docket No. 106) Ex. A.

signs.  Other than that occurrence and any interaction that may have resulted from the prosecution of the charges contained in the citations he filed, Scott has had no interaction with Plaintiff since December 8, 2001.  (Id. ¶ 3.)

<u>Incident Involving George Stevenish</u>

Trooper Scott states that, on December 8, 2001, he was in the area of the Haagensen property when Plaintiff  flagged him down.  She said some people were hunting on someone else's property and that they were not allowed to hunt there.  She said she went up to those who were hunting and confronted them.  (Scott Decl. ¶ 4.)  He states that, after he spoke with Plaintiff, another vehicle pulled up behind him and that George Stevenish, the driver of that vehicle, then informed him that he had been hunting, with the permission of the landowner, when Plaintiff approached him.  He said Plaintiff was yelling and swearing at him while he was hunting.  (Id. ¶ 5.)  Trooper Scott states that, based on the information he gathered during these interviews, he concluded that grounds existed to believe Plaintiff violated the Game Code by her actions.  Accordingly, he prepared a citation under 34 Pa. C.S. §2302(a.1)(2).  (Id. ¶ 6.)  He states that his decision to issue that citation was solely motivated by his belief that Plaintiff violated the Game Code when she approached and harassed Stevenish when he was engaged in lawful hunting.  (Id. ¶ 7.)  He states that his decision to cite her was not motivated to any degree by any retaliatory animus or any anti-hunting views that she may have expressed.  Rather, he states that he was motivated solely by her actions, which he believed may have constituted harassment under the HHS.  (Id. ¶ 8.)

However, Plaintiff states that she told Trooper Scott that the hunters were crossing over into her property and that she testified to this fact in the Court of Common Pleas.  She further

states that, to the best of her knowledge, Stevenish was still at the top of the hill when she spoke

to Trooper Scott, which is consistent with Stevenish's testimony that he and his son were on their

way home when they spoke to Trooper Scott.  (Haagensen Aff. ¶¶ 1-5.)[6]  She also notes that

Trooper Scott was not an eye-witness to Stevenish's location at the time he and Plaintiff

encountered each other and therefore Scott cannot testify to the "fact" that Stevenish was at all

times engaged in lawful hunting.  (Id. ¶ 9.)

With respect to this incident, the Commonwealth Court summarized the evidence as

follows:

> Stevenish testified that, on December 8, 2001, he was hunting with his son on
> property where they had permission to hunt when he saw Haagensen get out of a
> vehicle and begin screaming.  He stated that Haagensen appeared extremely
> agitated and walked up a power line to where he and his son were hunting, yelling
> at them to get out and waving her hands.  According to Stevenish, when he and
> his son walked away to avoid a confrontation, Haagensen followed for a short
> time but stopped when he and his son reached the top of the hill.  Stevenish said
> that he and his son then left for home but ran into Trooper Scott and stopped to
> talk to him.  On cross-examination, Stevenish admitted that he did not know
> where Haagensen's property line started, and he acknowledged that Haagensen
> never threatened him, struck him, put up barriers or chased deer away.
> Stevenish's fourteen-year-old son offered similar testimony....
>
> Trooper Scott testified that he spoke to both Haagensen and the
> Stevenishes separately.  He stated that he saw Haagensen first and that she was
> agitated; she said that she had seen hunters walking toward her property and that
> she told them to leave.  Trooper Scott stated that he later issued citations to
> Haagensen based on what the Stevenishes told him of the incident.
>
> With respect to this incident, Haagensen testified that she witnessed a
> hunter going straight into her woods, and, so, she parked on the property of her
> neighbor, Harry Lindsey, where she was allowed, and approached the hunter on

_____

[6]Pl.'s Counter Statement of Facts (Docket No. 112) Ex. 1.  In her Counter Statement,
Plaintiff also cites to the record that was reproduced before the Commonwealth Court ("RR").
However, that record is not part of the record in this case and this Court does not have access to
it.

foot.  Haagensen stated that when she was part of the way up, other hunters
shouted out "look out, she's coming," and someone fired a shot close to her.  She
said that, at that point, she screamed "you're on private property" and then turned
and went back down.  According to Haagensen, on the way down, hunters
screamed, "you bitch, we'll kill you."  Haagensen acknowledged speaking to
Trooper Scott and demanding that the people leave her property.

Haagensen, 900 A.2d at 472 (record citations omitted).

Incident Involving Leslie McBride

Trooper Scott states that, later on that same date (December 8, 2001), he was dispatched

to the same general area to respond to a call in which Plaintiff had complained that hunters were

trespassing on her property.  (Scott Decl. ¶ 9.)  When he arrived at the scene, Plaintiff's mother

was sitting in a truck parked by the road and Plaintiff and a group of hunters were coming out of

the woods.  (Id. ¶ 10.)  Trooper Scott spoke with Plaintiff, who stated that she called the police

because there were hunters hunting on her property.  (Id. ¶ 11.)

Trooper Scott states that he then spoke with some of the hunters involved. One of the

hunters, who was a member of the McBride family, stated that his party was hunting on the

McBride property when Plaintiff approached and confronted them.  He stated that she was

yelling and screaming at them while they were hunting.  He said it happens every year, even

though he is careful to stay on his property and not go on the Haagensen property.  (Id. ¶ 12.)

Trooper Scott states that, based on the information he gathered during these interviews, he

concluded that grounds existed to believe Plaintiff violated the Game Code by her actions.

Accordingly, he prepared a citation under 34 Pa. C.S. §2302(a.1)(2).  (Id. ¶ 13.)

Trooper Scott asserts that his decision to issue that citation was solely motivated by his

belief that Plaintiff violated the Game Code when she approached or entered the McBride

property with the intention of harassing the hunters, and then yelling and swearing at them while

they were hunting.  (Id. ¶ 14.)  He states that his decision to cite Plaintiff was not motivated to any degree by any retaliatory animus or any anti-hunting views that she may have expressed. Rather, he was motivated solely by Plaintiff's actions, which Scott believed may have constituted harassment under the HHS.  (Id. ¶ 15.)

However, Plaintiff denies that she called Trooper Scott; rather, when she encountered a large unrostered group of hunters attempting to sweep across her property, he was waiting on the road with Game Warden Kendall as she walked out of the woods toward her truck.  (Haagensen Aff. ¶ 11.)  She further states that Leslie McBride admitted that there were hunters trespassing on her property and that Trooper Scott never questioned the hunters on the road as to whether anyone else was actively trespassing on Haagensen property, and that when she told Trooper Scott that McBride had withheld the information that hunters were in fact trespassing on her property, he did not accuse McBride of filing a false report.  (Id. ¶¶ 13-14.)  She states that Trooper Scott took no action when informed that the McBride party was hunting illegally because it was unrostered and that he failed to disarm a large group of hunters in possession of loaded rifles when he questioned her in their presence.  (Id. ¶¶ 15-16.)  She notes that Trooper Scott conducted no competent investigation to determine the truth of her complaints about trespassing and reckless behavior by the hunters, but instead he responded to her complaints by citing her for allegedly violating the HHS.  (Id. ¶¶ 17-18.)

With respect to this incident, the Commonwealth Court stated as follows:

Lester McBride testified that on December 8, 2001, he was hunting with a group of approximately eight other persons in a section of woods that he owned, and while they were involved in a "drive" near the boundary of Haagensen's property, Haagensen confronted some of the men in the group, yelling that they were on her property.  Lester McBride testified that everyone walked to the road and talked to Trooper Todd Scott, at which point Haagensen claimed that people were

trespassing on her property, and McBride denied the accusation.  On cross-examination, Lester McBride acknowledged that there were, in fact, hunters trespassing on Haagensen's property at the time, but McBride insisted that the trespassers were not part of his group.  Lester McBride also acknowledged that he had not filed a roster for his hunting party because he did not think there were enough hunters to require such a filing.

Trooper Scott confirmed that Haagensen complained to him about hunters trespassing on her property, and he agreed that Haagensen would have a right to tell trespassers to leave.  Trooper Scott also acknowledged that when Lester McBride denied being on Haagensen's property, he never mentioned that there were persons outside his group trespassing on Haagensen's land.  Trooper Scott stated that he later cited Haagensen based on the information he received from McBride.

With respect to this incident, Haagensen testified that she saw cars dropping off hunters and that she walked along the gas line where she knew they would be going.  She stated that, first, she was on a neighbor's property where she was allowed; she then crossed onto her own property, and when she saw hunters, she started screaming at them to get off her property.

Haagensen, 900 A.2d at 471-72 (footnote and record citations omitted).[7]

Incident Involving the Ferrignos

Clyde Jones is currently employed by the Pennsylvania State Police as a Trooper assigned to Troop D, New Castle barracks.  He has been so employed for approximately 13 years.  Prior to that time, he was assigned to Troop B.  (Jones Decl. ¶ 1.)[8]  Trooper Jones issued two citations to Plaintiff for events that occurred on December 3, 2001.  Other than those two citations, Trooper Jones has not filed any criminal charges or citations against her.  (Id. ¶ 2.)  Other than any interaction that may have resulted from the prosecution of the charges contained in the citations he issued, Trooper Jones has had no interaction with Plaintiff since December 3, 2001.

---

[7]The Commonwealth Court opinion identifies as  "Lester McBride" the same individual as "Leslie McBride" named herein.

[8]Docket No. 106 Ex. B.

Additionally, he had no interaction with her prior to that date.  (Id. ¶ 3.)[9]

On December 3, 2001, Trooper Jones was dispatched to respond to a call.  Upon arriving at the scene, Trooper Jones spoke with Plaintiff.  She told him that two hunters were hunting from the road.  (Id. ¶ 4.)

Trooper Jones states that he then talked to Cathy Ferrigno and Gary Ferrigno, the two hunters involved, and that they explained that they were hunting in a field by a round hay bale, and not from the road as Plaintiff had reported.  (Id. ¶ 5.)  He states that the Ferrignos told him that Plaintiff  kept driving by blowing the horn while they were hunting and that she had followed them when they had previously switched hunting locations due to her actions.  (Id. ¶ 6.)

Trooper Jones states that, while he was still at the location, the Ferrignos walked across the road in an attempt to continue hunting in a nearby location, but Plaintiff followed and yelled at them, stating that they could not hunt there.  (Id. ¶ 7.)  Subsequently, Trooper Jones spoke with the owner of the land in question, and confirmed that the Ferrignos had his permission to hunt there.  (Id. ¶ 8.)

Trooper Jones states that, based on the information he gathered during these interviews, as well as his observations of Plaintiff's actions, he concluded that grounds existed to believe she violated the Crimes Code.  Accordingly, he prepared citations under 18 Pa. C.S. § 2709(a)(2).  Trooper Jones prepared one citation for each victim.  (Id. ¶ 9.)  He states that his sole motivation for issuing these citations was his belief that Plaintiff violated the crimes code by harassing the victims and following them about in a public place, that he did not file the citation in retaliation

_____

[9]Plaintiff indicates that she may have had some contact with Trooper Jones prior to December 3, 2001, but she is unable to remember the dates or precise occasions over the past ten years or more.  (Docket No. 112 ¶ 19.)

10

for anything Plaintiff may have said or done and that his decision to cite her was not motivated to any degree by any anti-hunting views that she may have expressed.  Rather, Trooper Jones states that he was motivated solely by Plaintiff's actions, which he believed may have constituted harassment under the criminal harassment statute.  (Id. ¶ 10.)

However, Plaintiff asserts that she witnessed two hunters with high-powered rifles in close proximity to the public road, that she drove past Cathy Ferrigno and came back down to tell her she could not hunt from that position and that Gary Ferrigno came out of the brush and into the middle of the road with a loaded rifle in his arms; he came up to her and said that he would kill her for interfering with his hunt.  (Haagensen Aff. ¶¶ 19-20.)  She states that it is false of Trooper Jones to represent that the Ferrignos were "hunting in a field" when Gary Ferrigno testified under oath that his wife was standing with a loaded rifle no more than ten yards off the road, when Cathy Ferrigno testified that she was in a possession of a loaded rifle and that the hay bales she stood beside were "at least ten feet off the road," and when Trooper Jones himself, when asked whether Plaintiff had told him the Ferrignos were hunting too close to the road, responded "possibly."  (Id. ¶ 22.)  She further states that Trooper Jones's representation that while he was still there the Ferrignos walked across the road in an attempt to continue hunting and that Plaintiff followed them and yelled at them is completely unsupported by the record.  (Id. ¶ 25.)  She notes that Trooper Jones stated under oath that he did not remember the name of the "landowner" and he still does not identify anyone who in theory gave the Ferrignos permission to hunt on a public road.  (Id. ¶ 26.)  Rather, she avers that Trooper Jones responded to her complaints about illegal hunting by the Ferrignos by issuing citations to her.  (Id. ¶ 28.)

With respect to this incident, the Commonwealth Court stated as follows:

11

This incident involved "victim" Kathy Ferrigno. Gary Ferrigno, the "victim's" husband, testified that, on December 3, 2001, he and his wife were hunting on a farm across the street from Haagensen's property, and Mrs. Ferrigno was to wait in a set location by the road for her husband to drive the deer down toward her.  He stated that his wife called later to say that she was scared because Haagensen was driving back and forth on the road, beeping her horn and yelling. Mr. Ferrigno testified that, when he reached his wife, Haagensen drove up to them and started yelling, "You can't hunt deer here, this ain't your property, you are too close to the road." Mr. Ferrigno stated that, at that point, he and his wife decided to drive up the road to another spot; however, Haagensen followed them, continued to yell and threatened to call the police.  On cross-examination, Mr. Ferrigno estimated that, at the first location, his wife was standing with her loaded rifle about ten yards from the public road.

Trooper Clyde Jones, who responded to Haagensen's complaint about the Ferrignos, testified that when he arrived on the scene, Haagensen explained that the Ferrignos were trespassing on her property.  Trooper Jones stated that he ascertained that the Ferrignos were not trespassing and, after hearing their story, later issued two citations to Haagensen.  On cross-examination, Trooper Jones admitted that Haagensen may also have complained that the Ferrignos were hunting too close to the road, but that he did not act on that.

Kathy Ferrigno testified that she was standing with her loaded rifle by some bales of hay facing away from the road when Haagensen began driving back and forth yelling at her to get out.  She stated that she called her husband to come down, and, in the meantime, Haagensen stopped her vehicle and was honking and screaming at her.  She further stated that, when she and her husband decided to go somewhere else, Haagensen followed them and continued to yell.  On cross-examination, Mrs. Ferrigno stated that, in her first position, she was at least ten feet from the road.

With respect to this incident, Haagensen testified that she saw Kathy Ferrigno with a rifle on a hay bale in the public road; therefore, she drove by and told her that she could not shoot from that position and had to get out.  Haagensen also stated that when Mr. Ferrigno arrived, he threatened to kill her and, so, she left and called the police.  Haagensen said that when the police officer finally arrived, he refused to take her statement and, instead, told her to shut up because the hunters were doing nothing wrong.  Haagensen stated that, as a result of her treatment, she called to register a complaint about the officer and, shortly thereafter, began to receive the citations.  Haagensen denied ever following the Ferrignos to a second location.

Haagensen, 900 A.2d at 472-73 (footnote and record citations omitted).[10]

    Incident Involving Wallace Reed

    Christian Winter retired from service with the Pennsylvania State Police in February,

2006.  Prior to his retirement, Winter was assigned to Troop D, New Castle barracks, as a

trooper.  He was so assigned for the entirety of his 25 years of service with the Pennsylvania

State Police.  (Winter Decl. ¶ 1.)[11]  Winter filed two citations and one criminal complaint against

Plaintiff for events that occurred on December 1, 2001.  Other than any interaction that may have

resulted from the prosecution of those charges, Winter has had no interaction with her since that

date.  (Id. ¶ 2.)  Other than the complaint and citations he filed against Plaintiff based on the

events of December 1, 2001, Winter has not filed any criminal charges or citations against her.

(Id. ¶ 4.)

    On December 1, 2001, Winter was dispatched to respond to a call from Plaintiff.  In that

call, she complained that there were trespassers on her property.  (Id. ¶ 5.)  Winter states that,

during his subsequent interview with Plaintiff, she told him that someone drove a truck into a

farm lane that she owns, thereby trespassing on her property.  (Id. ¶ 6.)

    Winter states that he then spoke with the operator of the truck, who informed Winter that

he did drive into the lane, but that it was his understanding that it was the driveway to the Reed

farm.  He also stated that he had the permission of Wallace Reed to hunt there.  (Id. ¶ 7.)  Winter

states that he then spoke to Mr. Reed, who confirmed that the lane in question was the driveway

---

    [10]The Commonwealth Court opinion identifies as "Kathy Ferrigno" the individual named
herein as "Cathy Ferrigno."

    [11]Docket No. 106 Ex. C.

to his farm, and that he owned it.  (Id. ¶ 8.)

Winter states that, based on these conversations, he concluded that Plaintiff had made a false report when she informed him that she owned the lane in question.  Accordingly, Winter filed a criminal complaint for the charge of false reports to law enforcement authorities.  (Id. ¶ 9.)

Winter states that his sole motivation for filing this criminal complaint was his belief that Plaintiff violated the crimes code by providing him with false information, that he did not file the complaint in retaliation for anything Plaintiff may have said or done, and that his decision to charge her was not motivated to any degree by any anti-hunting views that she may have expressed.  Rather, he was motivated solely by her false statements and his belief that she had violated the law.  (Id. ¶ 10.)  Winter states that it is "his understanding" that the false report charges were withdrawn by the District Attorney at the preliminary hearing.  (Id. ¶ 11.)

However, Plaintiff asserts that the hunters were parked in her driveway and therefore she did not make a false report to law enforcement authorities.  (Haagensen Aff. ¶¶ 29-30.)  She notes that Reed could not "confirm" that he owned the driveway by titled deed because the driveway is on Haagensen property until it curves to the right and crosses the Reeds' border.  (Id. ¶ 32.)  Rather, she avers that Winter cited her for making false reports to law enforcement authorities in retaliation for her having complained about hunters trespassing on her property. Finally, she notes that Winter was present when the charges were withdrawn by the District Attorney.  (Id. ¶ 33.)

Incident Involving Michael McBride

Also on December 1, 2001, Winter spoke with Plaintiff about another alleged incident of trespassing. Plaintiff stated that she confronted a group of hunters and accused them of

14

trespassing.  She identified one of these hunters as Michael McBride, and said that they were at least 100 feet onto her property.  (Winter Decl. ¶ 12.)

After speaking with Plaintiff, Winter talked with McBride.  McBride informed Winter that his family's property adjoined Plaintiff's property.  He also told Winter that he cut an ATV trail at least 10 feet on his side of the property line, and informed those hunting with him that they should stay on his side of the ATV trail to ensure that they did not enter Plaintiff's property. (Id. ¶ 13.)

Winter states that McBride also indicated that, to the best of his knowledge, everyone in his hunting party stayed on the correct side of the ATV trail and did not go on Plaintiff's property at any time.  (Id. ¶ 14.)  McBride told Winter that Plaintiff approached him and those hunting with him, and yelled and swore at them while they were hunting.  He said that he and the other hunters were on his property when this occurred.  (Id. ¶ 15.)  McBride also stated that he pointed out surveyor stakes to Plaintiff, which proved that the hunters were on the McBride property when she confronted them, but that she continued to yell and swear at them.  (Id. ¶ 16.)

Winter then interviewed Nate Aikens, one of the hunters who was with McBride. According to Winter, Aikens stated that he was hunting on the McBride's property, when Plaintiff approached them, got in his face, and yelled and swore at them while they were hunting. (Id. ¶ 17.)  Winter states that, based on the information he gathered during these interviews, he concluded that grounds existed to believe Plaintiff  violated the Game Code by her actions. Accordingly, he filed two citations, one under 34 Pa. C.S. § 2302(a.1)(2) and the other under § 2302 (a.1)(7).  (Id. ¶ 18.)

Winter states that his decision to file those citations was solely motivated by his belief

that Plaintiff violated the Game Code when she entered McBride's property with the intention of

harassing the hunters, and then yelling and swearing at them while they were hunting.  (Id. ¶ 19.)

Winter states that his decision to cite Plaintiff was not motivated to any degree by any retaliatory

animus or any anti-hunting views that she may have expressed.  Rather, Winter states that he was

motivated solely by her actions, which he believed may have constituted harassment under the

HHS.  (Id. ¶ 20.)

However, Plaintiff states that she told Winter that Michael McBride was with the other

trespassing hunters at the second Haagensen farm but was not carrying a rifle and was not

hunting when she confronted him and that McBride admitted to this fact when he testified in

court.  (Haagensen Aff. ¶ 34.)  She notes that she testified at trial that the ATV trail had been cut

onto parts of Haagensen property by the McBrides and that Nathaniel Aikens was on her property

when she saw him.  (Id. ¶ 35.)  She asserts that McBride and Aikens were hunting on Haagensen

property and that Winter was not a witness to the hunters' location when she found them.  (Id.

¶¶ 36-37.)  She further notes that Winter was not a witness to the altercation that took place

between her, McBride and Aikens.  (Id. ¶ 39.)  Rather, she asserts that Winter responded to her

complaints of hunters trespassing on her property and hunting without permission by citing her

for allegedly violating the HHS.  (Id. ¶ 40.)

With respect to this incident, the Commonwealth Court stated as follows:

[Michael McBride] testified that, on December 1, 2001, he was hunting with a
few friends and family members on the McBride property, which abuts
Haagensen's land.  Michael McBride stated that he asked his friend, Nate Aikens,
to stay in a particular spot and wait for the others to push some deer in his
direction.  According to Michael McBride, the spot was close to, but not on,
Haagensen's property.  Michael McBride testified that, later, he heard screaming,
went to where Aikens was sitting and saw that Haagensen was yelling loudly at
Aikens.  On cross-examination, Michael McBride conceded that Haagensen only

complained about people trespassing on her property; she did not threaten anyone, block anyone's shot or chase away any deer.  Michael McBride stated that he asked Haagensen to leave, and she did.

Aikens testified that he had been invited to go hunting with the McBrides and that Michael McBride had posted him in a spot and told him not to cross the path or he would be on someone else's property.  Aikens said that, while he was at the assigned location, Haagensen confronted him screaming and yelling that he should get out because he was illegally hunting on her property.  Aikens said that when Michael McBride subsequently arrived, he told Haagensen that this was McBride property; Michael McBride then walked farther into McBride property and told Haagensen, "Now, you are on my property, please leave."  Aikens stated that Haagensen left and called the state police.

Christian Winter, a Pennsylvania State Trooper, testified that Haagensen called him to complain that Michael McBride and his friends were hunting on her property; however, Trooper Winter stated that he later filed citations against Haagensen based on information received from speaking to Michael McBride and Aikens.  On cross-examination, Trooper Winter confirmed that Haagensen reported that hunters were trespassing and, thus, illegally hunting on her property.

With respect to this incident, Haagensen testified that she was driving down the road and glimpsed orange at the top left-hand corner of her property, indicating that hunters were going in.  Haagensen stated that she drove into a driveway on her property, got out of the car and walked toward the hunters.  She testified that, when Michael McBride and Aikens saw her approach, they started back toward the McBride property, but they were still on her land when she got to them.

Haagensen, 900 A.2d at 470-71 (record citations omitted).

As noted above, by opinion dated June 2, 2006, the Commonwealth Court reversed the

convictions.  The court held that the Commonwealth had failed to adduce sufficient evidence that

Plaintiff acted with the specific intent to violate the HHS.  Specifically, the court stated that:

Haagensen testified that she felt she had a right to protest the actions of the "victims" here because, in the cases of the McBrides and Stevenish, she believed that the hunters were unlawfully trespassing on her property, and, in Ferrigno's case, she believed that Kathy Ferrigno was illegally hunting too close to a public road.  The trial court completely disregarded this testimony and, in fact, did not mention it at all in its five extremely brief opinions.  In doing so, the trial court impliedly believed the version of events offered by the Commonwealth's

17

witnesses. However, even accepting the testimony of the Commonwealth witnesses, there is nothing in that testimony to refute Haagensen's position regarding the motivation for her actions.

To the contrary, Michael McBride, Lester McBride, Aikens, Trooper Winter and Trooper Scott each testified that Haagensen's agitation and complaints all related to hunters trespassing on her property. Lester McBride even acknowledged that hunters were, in fact, trespassing on Haagensen's property during the December 8, 2001, incident, and he conceded that when Haagensen reacted, she had no way of knowing that those hunters were not a part of McBride's group. In the case of the Ferrignos, Gary Ferrigno testified that Haagensen's shouts were in the nature of reprimands about hunting too close to the public road, and Trooper Jones also acknowledged such a complaint. In addition, the record establishes that it was Haagensen, not the "victims," who called the authorities in these cases. This evidence supports the conclusion that Haagensen believed, either rightly or wrongly, that the "victims" here were engaging in the *unlawful* taking of wildlife, and Haagensen merely sought to warn the hunters not to trespass on her property or hunt illegally near her farm. See Commonwealth v. Wheaton, 409 Pa. Super. 622, 598 A.2d 1017 (1991) (holding that, by complaining and threatening to sue, the defendant's intent was not to harass but to serve a legitimate purpose, where he believed that the water association improperly intended to shut off his water).

Because the Commonwealth's evidence fails to support a finding that Haagensen acted with the intent to interfere with the lawful taking of wildlife, the trial court erred in concluding that the Commonwealth sustained its burden of proof. Accordingly, we reverse the trial court to the extent it found that Haagensen violated sections 2302(a.1)(2) and (7) of the Hunter Harassment Statute.

Haagensen, 900 A.2d at 475 (footnotes omitted).

Procedural History

Plaintiff filed this action on May 27, 2008. Count I alleges that the HHS is

unconstitutional on its face and as applied to her and that § 2709 is unconstitutional as applied to

her because they infringe on her First Amendment rights of free speech and free association as

well as her Fourteenth Amendment rights of due process and equal protection. In addition,

Count I contains a claim that she was subjected to a retaliatory prosecution. It is brought

18

pursuant to § 1983.  Count II alleges that Plaintiff was falsely arrested in violation of her rights
under the Fourth Amendment, and Count III alleges that she was subjected to a malicious
prosecution, also in violation of her rights under the Fourth Amendment; they are also brought
pursuant to § 1983.  Finally, Count IV alleges that Defendants' actions violated Plaintiff's rights
under the Pennsylvania constitution (Article I, §§ 1, 7 and 27) and further alleges state law claims
of false arrest, intentional infliction of emotional distress, trespass, negligence, gross negligence,
and negligent hiring, training, retention and supervision.

As noted above, various motions to dismiss were filed on behalf of numerous defendants.
After a Report and Recommendation and Supplemental Report and Recommendation were filed
and after the Supplemental Report and Recommendation was adopted as the opinion of the
Court, many of the claims were dismissed.  The following claims remained in the case: in Count
I, the constitutional challenges to the HHS and § 2709 (against the State Police and the Game
Commission), and the claims of First Amendment retaliation, violation of due process and equal
protection (against all defendants except Game Warden Kendall); in Count IV, the constitutional
challenges to the HHS (against the State Police and the Game Commission).[12]  On September 10,
2009, Plaintiff and the Commonwealth Defendants filed cross-motions for summary judgment on
the constitutional challenges.

On September 10, 2009, Plaintiff and the Commonwealth Defendants filed cross-motions
for summary judgment with respect to the constitutional issues.  On October 22, 2009, a Report
and Recommendation was filed, recommending that the Commonwealth Defendants' motion be

---

[12]Defendant Cathy Vasko a/k/a Cathy Ferrigno a/k/a Cathy Leary has filed a notice of
bankruptcy.  Remaining defendants Nathaniel Akins and Ben Sherry had answers due on October
9, 2008 but have not made an appearance in this case.

granted and that Plaintiff's motion be denied.  On November 16, 2009, the Report and

Recommendation was adopted as the opinion of the Court.

Thus, the only claims remaining are those alleging that the Defendants retaliated against

her for exercising her freedom of speech and violated her rights to due process and equal

protection of the laws.  On October 30, 2009, the Commonwealth Defendants filed a motion for

summary judgment as to these claims.[13]

Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing

that there is a genuine issue for trial" or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty-

---

[13]Although all Defendants were permitted to move for summary judgment as to these
remaining claims, only the Commonwealth Defendants have chosen to do so.

Lobby, Inc., 477 U.S. 242, 248 (1986).

The Commonwealth Defendants argue that: 1) Plaintiff cannot maintain her First Amendment retaliatory prosecution claim because she has failed to demonstrate that the State Police issued citations to her in retaliation for having exercised her right to free speech; 2) she cannot maintain a procedural due process claim because she was afforded the full panoply of rights that accompany a criminal trial and appeal and she cannot maintain a substantive due process claim because she has a claim under the First Amendment; 3) she cannot maintain an equal protection claim because she has not pointed to any similarly situated individuals who were treated differently; and 4) the Commonwealth Defendants are entitled to the protections of qualified immunity.

Plaintiff responds that: 1) the facts concerning her First Amendment retaliatory prosecution claim are vigorously disputed and the Commonwealth Defendants' proffered facts are not even consistent with the testimony presented to the Court of Common Pleas; 2) her arrest without probable cause violated her right to due process of law; 3) classifications impacting fundamental constitutional rights are subjected to heightened scrutiny and she is a member of a class of persons desiring to engage in the protected First Amendment activity of voicing their objections to illegal hunting and in addition she can maintain a claim as a "class of one" who was subjected to governmental action wholly impossible to relate to legitimate governmental objectives; and 4) genuine issues of material fact exist and the fact that her First Amendment right to free speech was clearly established in 2001 preclude the defense of qualified immunity.

First Amendment Retaliatory Prosecution Claim

The First Amendment provides that "Congress shall make no law ... abridging the

21

freedom of speech." U.S. Const. Amend. 1. "First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907 n.43 (1982). Plaintiff alleges that Defendants retaliated against her for exercising her First Amendment right of free speech.

The Court of Appeals for the Third Circuit has held that a plaintiff in a First Amendment retaliation case must prove: "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." Eichenlaub v. Township of Indiana, 385 F.3d 274, 282 (3d Cir. 2004) (citing Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997)). See also Thomas v. Independence Township, 463 F.3d 285, 296 (3d Cir. 2006). In Hartman v. Moore, 547 U.S. 250, 258 (2006), the Supreme Court held that, in a civil rights case in which the plaintiff is alleging a claim of First Amendment retaliation that takes the form of a prosecution, she must also plead and prove the absence of probable cause supporting the prosecution.[14]

The Commonwealth Defendants concede that Plaintiff engaged in constitutionally-protected activity and that she was subjected to prosecution by the government, but they contend that she cannot demonstrate a causal connection between these events and that she cannot

_____

[14]In cases in which the prosecutor withdraws the charge and the plaintiff is pursuing a claim of "retaliatory arrest" against the police, courts are divided as to whether the plaintiff must demonstrate a lack of probable cause. Compare Williams v. City of Carl Junction, Mo., 480 F.3d 871, 876 (8th Cir. 2007) (when mayor allegedly induced police to issue 26 citations to the plaintiff, the case raised the same causation complications as Hartman and the plaintiff had to prove a lack of probable cause) and Barnes v. Wright, 449 F.3d 709, 720 (6th Cir. 2006) (requiring plaintiff to prove lack of probable cause because Hartman "sweeps broadly") with Skoog v. County of Clackamas, 469 F.3d 1221, 1234 (9th Cir. 2006) (Hartman rule does not apply in a retaliatory arrest situation) and Gullick v. Ott, 517 F. Supp. 2d 1063, 1072 (W.D. Wis. 2007) (same). However, in this case, only one of the charges was withdrawn and Plaintiff agrees that she needs to prove the lack of probable cause.

demonstrate the absence of probable cause.  Plaintiff contends that she can establish a causal

connection and that there was no probable cause for the citations she received.

Causal Connection

The Commonwealth Defendants argue that the "the undisputed evidence reveals that

Troopers Scott, Jones and Winter filed the citations and complaint at issue solely based on their

belief that Haagensen had violated various Pennsylvania statutory provisions, including 18 Pa.

C.S.A. § 2709 and 34 Pa. C.S.A. § 2302."  (Commw. Defs.' Br. at 4.)[15]  However, the evidence is

not undisputed: Plaintiff disputes the underlying facts and points out that some of the statements

advanced by the state troopers are inconsistent with testimony provided to the Court of Common

Pleas.  Although the state troopers can testify as to what the believe their motivations were and

what they witnessed, Plaintiff can also testify from personal knowledge about what she said and

what she witnessed during these incidents.  Viewing the evidence in favor of Plaintiff as the non-

moving party, the trier of fact could conclude that Plaintiff called the state police on four separate

occasions to report hunters trespassing on her property or hunting in illegal ways near her

property, yet in each case the state police not only did not cite the hunters but returned to cite

Plaintiff for violating the HHS or § 2709.  Because the question of whether there is a causal

connection between Plaintiff's free speech and the citations she received is a critical issue in this

case and the underlying facts are disputed, the issue cannot be resolved in the context of a motion

for summary judgment.

In addition, the Court of Appeals has explained that a plaintiff can substantiate a causal

connection between protected activity an adverse response by: 1) showing that the temporal

---

[15]Docket No. 107.

proximity is "unduly suggestive"; or 2) showing "inconsistencies in the defendant's testimony";

or 3) pointing to ongoing antagonism.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81

(3d Cir. 2000).  In this case, Plaintiff's protected activity of engaging in free speech was followed

almost immediately by state troopers issuing the citations.  Therefore, under the legal standard,

she has proffered evidence to support her claim of retaliation.

Lack of Probable Cause

The Supreme Court has defined probable cause as "facts and circumstances ... sufficient

to warrant a prudent person, or one of reasonable caution, in believing in the circumstances

shown, that the suspect has committed, is committing, or is about to commit an offense."

Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (citations omitted).  The Court has further noted

that "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the

degree of suspicion that attaches to particular types of non-criminal acts."  Illinois v. Gates, 462

U.S. 213, 243 n.13 (1983).

The Court of Appeals for the Third Circuit has stated that:

Generally, the question of probable cause in a section 1983 damage suit is one for
the jury.  This is particularly true where the probable cause determination rests on
credibility conflicts.  However, a district court may conclude that probable cause
exists as a matter of law if the evidence, viewed most favorably to Plaintiff,
reasonably would not support a contrary factual finding, and may enter summary
judgment accordingly.

Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788-89 (3d Cir. 2000) (citations omitted).  The

court also held that "the common law presumption raised by a magistrate's prior finding that

probable cause exists does not apply to section 1983 actions."  Id. at 789.

The Commonwealth Defendants argue that Troopers Scott, Jones and Winter had

probable cause, based on their interviews with the victims, to conclude that Plaintiff had violated

24

the HHS and § 2709.  The individuals all stated that they were lawfully hunting on their own land or land on which they had permission to hunt when Plaintiff approached them and verbally berated them.  The Commonwealth Defendants contend that the fact that the Commonwealth Court ultimately determined that the District Attorney did not present sufficient evidence to counter Plaintiff's assertion that she believed the victims were hunting illegally is irrelevant.

However, as Plaintiff points out, the Commonwealth Court did not merely conclude that there was insufficient evidence to support the convictions.  Rather, the court found a lack of "any evidence" to support the findings that she had no legitimate purpose for her actions and/or that she intended to interfere with a lawful hunt.  Haagensen, 900 A.2d at 475.  The court held that, even accepting only the testimony of the Commonwealth witnesses, there was nothing in the record to refute Plaintiff's position regarding the motivation for her actions: the McBrides, Nate Aikens and Troopers Scott and Winter all testified that her agitation and complaints related to hunters trespassing on her property (and Leslie McBride admitted that hunters were in fact on her property and she had no way of knowing that they were not part of his group) and Gary Ferrigno and Trooper Jones testified that her shouts were in the nature of reprimands about hunting too close to a public road.

Moreover, at this stage of the proceedings in this Court, the evidence must be construed in Plaintiff's favor and the credibility determinations in the record cannot be resolved on a motion for summary judgment.  See Montgomery v. De Simone, 159 F.3d 120, 125-26 (3d Cir. 1998) (plaintiff was arrested for speeding and drunk driving, but her testimony and that of her witnesses raised a number of issues about the version of events as presented by the officer and the issue of whether the officer had probable cause for the arrest could not be resolved on a

motion for summary judgment).

Qualified Immunity

The Commonwealth Defendants contend that they are entitled to qualified immunity.  As

recently summarized by the Court of Appeals for the Third Circuit:

> Government officials are immune from suit in their individual capacities unless,
> "taken in the light most favorable to the party asserting the injury, ... the facts
> alleged show the officer's conduct violated a constitutional right" and "the right
> was clearly established" at the time of the objectionable conduct.  Saucier v. Katz,
> 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). For a right to be
> clearly established, "[t]he contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is doing violates that right." Id.
> at 202, 121 S.Ct. 2151 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107
> S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "If officers of reasonable competence could
> disagree on th[e] issue, immunity should be recognized." Malley v. Briggs, 475
> U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The Supreme Court
> recently held that the sequence of the two-part Saucier analysis is no longer
> mandatory; trial courts are now permitted to use discretion as to which prong of
> the analysis to apply first. See Pearson v. Callahan, --- U.S. ----, 129 S.Ct. 808,
> 818, 172 L.Ed.2d 565 (2009).
>
> Qualified immunity is a complete immunity from suit, not just a defense
> to liability, and is considered at the earliest possible stage of proceedings, apart
> from the analysis of the underlying claim itself. Saucier, 533 U.S. at 194, 121
> S.Ct. 2151. The issue of qualified immunity is generally a question of law,
> although a genuine issue of material fact will preclude summary judgment on
> qualified immunity. See Deary v. Three Un-Named Police Officers, 746 F.2d 185,
> 192 (3d Cir.1984); Czurlanis v. Albanese, 721 F.2d 98, 108 n. 8 (3d Cir.1983).

Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).  In Giles, the court rejected a qualified

immunity defense because the crucial facts regarding whether an inmate was restrained on the

ground and had ceased resisting when officers hit and kicked him were disputed.

Similarly, in this case, the crucial facts regarding whether Plaintiff was following hunters

onto property that was not hers and verbally harassing them intentionally for no reason other than

to prevent the lawful taking of wildlife are disputed.  Moreover, the recurring pattern of these

incidents is striking: on each occasion Plaintiff was the one who initially contacted the police to report hunters trespassing on her property or engaging in an unlawful hunt, yet every time the police not only did not accept her version of events but also concluded that she had been harassing the hunters.

The Commonwealth Defendants observe that Plaintiff's case was the first reported opinion with respect to the HHS and thus the law was not "clearly established" in December 2001. They contend that reasonable minds could differ as to whether her actions violated the statute. "To be established clearly, however, there is no need that 'the very action in question [have] previously been held unlawful.'" Safford Unified Sch. Dist. No. 1 v. Redding, 129 S.Ct. 2633, 2643 (2009) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)). It is "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman, 547 U.S. at 256 (citation omitted).

The Commonwealth Defendants have not shown that State Troopers Winter, Scott and Jones could reasonably have thought in December 2001 that they could cite Plaintiff for violating the HHS or § 2709 (and continue to prosecute these charges against her) when she told them that the hunters were trespassing on her property or otherwise not engaged in a lawful hunt. Moreover, they have not argued, much less demonstrated, that they reasonably believed that they could cite her *because* she complained about certain hunting activities.

In addition, the Court of Appeals has discussed the difficulty of applying a qualified immunity analysis in connection with a First Amendment retaliation claim:

> The qualified immunity analysis requires a determination as to whether reasonable officials could believe that their conduct was not unlawful even it was in fact

> unlawful.  See In re City of Philadelphia Litig., 49 F.3d [945,] 961 n.14 [(3d Cir. 1995)].  In the context of a First Amendment retaliation claim, that determination turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory. Even assuming that this could be demonstrated under a certain set of facts, it is an inquiry that cannot be conducted without factual determinations as to the officials' subjective beliefs and motivations, and thus cannot properly be resolved on the face of the pleadings, but rather can be resolved only after the plaintiff has had an opportunity to adduce evidence in support of the allegations that the true motive for the conduct was retaliation rather than the legitimate reason proffered by the defendants.  See Sheppard [v. Beerman], 94 F.3d [823,] 828-29 [(2d Cir. 1996)].

Larsen v. Senate of the Commonwealth of Pennsylvania, 154 F.3d 82, 94 (3d Cir. 1998)

(footnote omitted).  See also Center v. Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d

807, 824-25 (6th Cir. 2007) (citing cases holding that "claims involving proof of a defendant's

intent seldom lend themselves to summary disposition" and rejecting qualified immunity defense

when evidence presented factual question as to whether police detained protestors because their

trucks displayed anti-abortion message).

     In this case, these principles demonstrate the difficulty of resolving the qualified

immunity question.  The Commonwealth Defendants present as "undisputed facts" the

statements by Troopers Jones, Scott and Winter that they issued citations to Plaintiff because

they believed that she violated the HHS or § 2709 and not because they harbored any retaliatory

animus toward her for having expressed anti-hunting sentiments.  But these are not facts:

although the state troopers can testify as to their belief as to what their motivations were, that

does not resolve the matter.  Moreover, these "facts" are disputed: Plaintiff has explained that she

called the state police on each occasion and informed them that various hunters were hunting

illegally (on her property, in a large unrostered group or too close to a public road).  According to

the Commonwealth Court's summary of the evidence, the testimony of the troopers and hunters

28

at the trial not only failed to provide enough support for the convictions, but also failed to

provide any support for the citations she received.  Therefore, the Commonwealth Defendants

have not demonstrated that they are entitled to qualified immunity and, with respect to Plaintiff's

First Amendment retaliatory prosecution claim, the motion for summary judgment should be

denied.

Due Process Claims

The Fourteenth Amendment provides that states shall not "deprive any person of life,

liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  The due process

clause contains both a procedural aspect and "a substantive sphere as well, barring certain

government actions regardless of the fairness of the procedures used to implement them."

County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (citations omitted).

However, the Supreme Court has held that "[w]here a particular Amendment provides an

explicit textual source of constitutional protection against a particular sort of government

behavior, that Amendment, not the more generalized notion of substantive due process, must be

the guide for analyzing these claims."  Id. at 842 (quoting Albright v. Oliver, 510 U.S. 266, 273

(1994)).  Because the First Amendment provides an explicit source of constitutional protection

for Plaintiff's claims, she cannot maintain a substantive due process claim as well.

With respect to her procedural due process claim, the Supreme Court has held that:

A § 1983 action may be brought for a violation of procedural due process, but
here the existence of state remedies is relevant in a special sense.  In procedural
due process claims, the deprivation by state action of a constitutionally protected
interest in "life, liberty or property" is not in itself unconstitutional; what is
unconstitutional is the deprivation of such an interest without due process of law.
Parratt [v. Taylor, 451 U.S. 527,] 537 [(1981)]; Carey v. Piphus, 435 U.S. 247,
259 (1978) ("Procedural due process rules are meant to protect persons not from
the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or

property").  The constitutional violation actionable under § 1983 is not complete
when the deprivation occurs; it is not complete unless and until the State fails to
provide due process.  Therefore, to determine whether a constitutional violation
has occurred, it is necessary to ask what process the State provided, and whether it
was constitutionally adequate.  This inquiry would examine the procedural
safeguards built into the statutory or administrative procedure of effecting the
deprivation, and any remedies for erroneous deprivations caused by statute or tort
law.

Zinermon v. Burch, 494 U.S. 113, 125-26 (1990) (footnote omitted).  The Commonwealth

Defendants argue that, although Plaintiff complains about the citations she received, she cannot

deny that state remedies existed to address them and that she successfully utilized these remedies

to have her convictions overturned.  Thus, she cannot maintain a procedural due process claim.

Plaintiff responds that an arrest without probable cause represents a violation of her

constitutional rights.  However, this Court has already held that, pursuant to binding authority

from the Court of Appeals for the Third Circuit, after being handed citations, "[a]ttending one's

trial is not a government 'seizure' in a 42 U.S.C. § 1983 malicious prosecution action for

violation of the Fourth Amendment."  DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d

Cir. 2005).  To the extent that she is arguing by implication that being handed citations and

having to attend her trial constituted deprivations of a "liberty interest" for purposes of the

Fourteenth Amendment's due process clause, this argument is similarly unsupported and

inconsistent with the case law in this area.[16]

In Vasquez v. City of Hamtramck, 757 F.2d 771 (6th Cir. 1985), the plaintiff brought a

§ 1983 claim against a city alleging that a police officer maliciously issued him parking tickets

without probable cause.  After holding that Vasquez could not base a procedural due process

---

[16]Plaintiff has a property interest in the money she paid as a fine.  Herrada v. City of
Detroit, 275 F.3d 553, 556 (6th Cir. 2001).

claim on the potential loss of property in the form of a fine because adequate state-court remedies

existed to redress any injury, the court held as follows:

> In addition, Vasquez' inconvenience in defending the allegedly malicious
> prosecution is an insufficient basis for a section 1983 claim. In Baker v.
> McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979), the
> Supreme Court held that a false imprisonment claim is not actionable under
> section 1983 and that the claimant there was required to seek his remedy in the
> state courts. In Baker, the plaintiff alleged that he was arrested and jailed due to a
> mistake and then wrongly held three days because of the police's alleged
> negligence in not sooner investigating his claim of mistake. Here, Vasquez'
> inconvenience was certainly a less serious loss than the actual deprivation of
> liberty in Baker. While Baker could be distinguished from the instant case because
> the tort alleged there was clearly not intentional, the Supreme Court has indicated
> that the difference between negligent and intentional torts is not necessarily
> determinative in section 1983 suits. See Hudson v. Palmer, 468 U.S. 517, 104
> S.Ct. 3194, 82 L.Ed.2d 393 (1984). Therefore, Vasquez' section 1983 suit, which
> is grounded in the inconvenience he suffered, is foreclosed by the Supreme
> Court's decision in Baker.

Id. at 773.  See also Jacobson v. Village of Northbrook, 1986 WL 14153, at *1 (N.D. Ill. Dec. 11,

1986) (observing that the court in Vasquez concluded that the liberty interest in not having to

contest tickets was so weak as to not require the police even to have probable cause to issue a

traffic citation), cause dismissed, 824 F.2d 567 (7th Cir. 1987).

Thus, there is no support for Plaintiff's reference to a liberty interest and, although she

has a property interest recognized in the law, the existence of adequate post-deprivation

procedures and her utilization of them foreclose her procedural due process claim arising out of

the issuance of the citations and her subsequent convictions.  Therefore, with respect to her due

process claims, the motion for summary judgment filed by the Commonwealth Defendants

should be granted.

Equal Protection Claim

The Fourteenth Amendment provides that states shall not "deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. Equal protection "directs that 'all persons similarly circumstanced shall be treated alike.'" Plyer v. Doe, 457 U.S. 202, 216 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)). "This provision creates no substantive rights." Vacco v. Quill, 521 U.S. 793, 799 (1997) (citation omitted). Only when a state "adopts a rule that has a special impact on less than all persons subject to its jurisdiction" does a question arise as to whether the Equal Protection Clause is violated." Alexander v. Whitman, 114 F.3d 1392, 1406 (3d Cir. 1997) (quoting New York City Transit Auth. v. Beazer, 440 U.S. 568, 587-88 (1979)). The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 563, 564 (2000) (citations omitted).

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'" Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (quoting Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)). See also Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008); Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006) ("a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.")

As the Commonwealth Defendants observe, Plaintiff has not pointed to other similarly

situated individuals who received different treatment than she did.  She posits that the HHS targets those who oppose hunting and that individuals who support hunting may speak freely. However, this argument constitutes a restatement of one of Plaintiff's First Amendment challenges to the HHS, and this Court has already rejected Plaintiff's contention that the HHS is a content-based restriction on speech.  Moreover, she has not proffered any evidence in support of this claim. Therefore, with respect to her equal protection claim, the motion for summary judgment filed by the Commonwealth Defendants should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendants Pennsylvania State Police, Clyde Jones, Todd Scott, Christian Winter and the Pennsylvania Game Commission on the non-constitutional issues of Plaintiff's complaint (Docket No. 105) be granted with respect to the Plaintiff's due process and equal protection claims and denied with respect to her First Amendment retaliatory prosecution claim.

Within the time specified in the Notice of Electronic Filing, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


Respectfully submitted,


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: December 14, 2009